988 P.2d 667

STATE of Hawai'i, Plaintiff–Appellant,

v.

James Kimo AKAHI, Defendant–Appellee,

and

State of Hawai'i, Plaintiff–Appellant,

v.

Terry N. Kaahanui, Defendant–Appellee.

No. 21639.

Intermediate Court of Appeals of Hawai'i.

Oct. 27, 1999.

As Amended Nov. 1 and Nov. 10, 1999.

Mark R. Simonds, Deputy Prosecuting Attorney, County of Maui, on the briefs, for Plaintiff–Appellant.

Steven Booth Songstad, Wailuku, on the briefs, for Defendant–Appellee James Kimo Akahi.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by BURNS, C.J.

Plaintiff–Appellant State of Hawai'i (the State) appeals the circuit court's May 28, 1998 Order Granting Defendants' Motion for New Trial. We affirm.

The State concedes that the circuit court violated the duty imposed on it by *Tachibana v. State*, 79 Hawai'i 226, 236–37, 240, 900 P.2d 1293, 1301, 1303–04, 1307 (1995) (footnotes omitted, footnote added), by failing to obtain on-the-record waivers from Co–Defendant/Appellee James Kimo Akahi (Akahi) and Co–Defendant/Appellee Terry Kaahanui (Kaahanui) of their right to testify. The State contends that the circuit court's violation of its *Tachibana* duty was harmless beyond a reasonable doubt. We disagree.

In *Tachibana*, the Hawai'i Supreme Court decided in relevant part as follows:

Thus, we hold that in order to protect the right to testify under the Hawai'i Constitution, trial courts must advise criminal defendants of their right to testify and must obtain an on-the-record waiver of that right [from the defendant in person [1]] in every case in which the defendant does not testify. . . .

. . . .

. . . [T]he ideal time to conduct the colloquy is immediately prior to the close of the defendant's case. Therefore, whenever possible, the trial court should conduct the colloquy at that time.

. . . .

Once a violation of the constitutional right to testify is established, the conviction must be vacated unless the State can prove that the violation was harmless beyond a reasonable doubt. . . .

■ *Tachibana* clearly mandates that "trial courts must advise criminal defendants of their right to testify and must obtain an on-the-record waiver of that right [from the defendant in person] in every case in which the defendant does not testify." *Id.* at 236, 900 P.2d at 1303. Whenever a trial court fails to perform its duty in this regard, *Tachibana* instructs that "the conviction must be vacated unless the State can prove that the violation was harmless beyond a reasonable doubt." *Id.* at 240, 900 P.2d at 1307.

## BACKGROUND

Akahi was indicted for the following offenses: Count One, Criminal Trespass in the Second Degree, Hawai'i Revised Statutes (HRS) § 708–814 (1993),[2] and Count Two, Escape in the Second Degree, HRS § 710–1021(1) (1993).[3] He was tried by a jury and found guilty on both counts.

Kaahanui was indicted for the following offenses: Count Two, Escape in the Second Degree, HRS § 710–1021,[4] and Count

---

1. Although the opinion in *Tachibana v. State*, 79 Hawai'i 226, 900 P.2d 1293 (1995), does not expressly state these words, it is obvious from the opinion that it implicitly does.

2. Hawai'i Revised Statutes (HRS) § 708–814(1)(a) (1993) states, "A person commits the offense of criminal trespass in the second degree if: (a) The person knowingly enters or remains unlawfully in or upon premises which are enclosed in a manner designed to exclude intruders or are fenced[.]"

3. HRS § 710–1021(1) (1993) states, "A person commits the offense of escape in the second

degree if the person intentionally escapes . . . from custody."

4. Co–Defendant/Appellee Terry Kaahanui (Kaahanui) was indicted as an accomplice under Count Two. The accomplice statute is found in HRS § 702–222 (1993) and states in relevant part as follows: "A person is an accomplice of another person in the commission of an offense if: (1) With the intention of promoting or facilitating the commission of the offense, the person: . . . (b) Aids or agrees or attempts to aid the other person in planning or committing it[.]"

Three,[5] Hindering Prosecution in the Second Degree, HRS § 710–1030 (1993).[6] He was tried by a jury and found guilty on both counts.

Co–Defendant Grace Akahi (Grace) was indicted for the following offenses: Count Two, Escape in the Second Degree, HRS § 710–1021(1);[7] Count Three, Hindering Prosecution in the Second Degree, HRS § 710–1030; Count Four, Terroristic Threatening in the First Degree, HRS § 707–716(1)(c) (1993);[8] and Count Five, Assault Against a Police Officer, HRS § 707–712.5(1)(a) (1993).[9] She was tried by a jury and found guilty on Counts Three, Four, and Five.

Grace is not an appellee in this appeal because she did not join in the Motion for New Trial filed by Kaahanui and joined by Co–Defendant/Appellee James Kimo Akahi (Akahi). The Motion for New Trial was based on the trial court's failure to obtain on-the-record responses from Akahi and Kaahanui in regard to waiving their right to testify. Grace testified at trial; therefore, there was no need for a waiver of her right to testify. Grace's appeal from her conviction is filed in No. 21675.

## STANDARD OF REVIEW

It has been concluded that the denial of a motion for new trial "is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion."

5. The original indictment filed on November 24, 1997, had six counts; however, Count Three (Theft in the Fourth Degree) was dismissed immediately prior to trial upon motion by the State of Hawai'i. The counts were then renumbered to reflect the change.

6. HRS § 710–1030(1) (1993) states, "A person commits the offense of hindering prosecution in the second degree if, with the intent to hinder the apprehension, prosecution, conviction, or punishment of another for a crime, he renders assistance to such person."

7. Grace was indicted as an accomplice on this charge. See supra n. 3.

8. HRS § 707–716(1)(c) (1993) states, "(1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening: ... (c) Against a public servant[.]"

State v. Ganal, 81 Hawai'i 358, 373, 917 P.2d 370, 386 (1996). However, this standard of review does not apply in situations where Hawai'i Rules of Penal Procedure (HRPP) Rule 52(a) (1999) applies. HRPP Rule 52(a) states that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." At footnote 12 of State v. Holbron, 80 Hawai'i 27, 32–33, 904 P.2d 912, 917–18 (1995), the Hawai'i Supreme Court concluded that the standard of review under HRPP Rule 52(a) is the "harmless beyond a reasonable doubt" standard of review.

■ More relevantly, the abuse of discretion standard of review also does not apply to the situation where the trial court fails to perform its Tachibana duty and "the conviction must be vacated unless the State can prove that the violation was harmless beyond a reasonable doubt." Tachibana, 79 Hawai'i at 240, 900 P.2d at 1307.

■ Under the harmless-beyond-a-reasonable-doubt standard, the question is "whether there is a reasonable possibility that error may have contributed to conviction." State v. Cabrera, 90 Hawai'i 359, 365, 978 P.2d 797, 803 (1999). "If there is ... a reasonable possibility ..., then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside." State v. Maumalanga, 90 Hawai'i 58, 62, 976 P.2d 372, 376

HRS § 707–715 (1993) defines terroristic threatening as follows:
   A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:
   (1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person; or
   (2) With intent to cause, or in reckless disregard of the risk of causing evacuation of a building, place of assembly, or facility of public transportation.

9. HRS § 707–712.5(1)(a) (1993) states: "(1) A person commits the offense of assault against a police officer if the person: (a) Intentionally, knowingly, or recklessly causes bodily injury to a police officer who is engaged in the performance of duty[.]"

(1998) (quoting *State v. Cullen,* 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997)).

■ When deciding whether an error is harmless beyond a reasonable doubt, the error must be viewed "in the light of the entire proceedings and given the effect which the whole record shows it to be entitled." *State v. Huihui,* 62 Haw. 142, 145, 612 P.2d 115, 117 (1980).

■ On appeal, the question whether an error was harmless beyond a reasonable doubt is a question of law reviewable *de novo* under the right/wrong standard of review.

## DISCUSSION

In this case, it is clear that the circuit court failed to obtain on-the-record waivers of the right to testify from Akahi and Kaahanui themselves and, thereby, failed to perform its *Tachibana* duty.

Prior to the conclusion of the State's case, the circuit court explained to all three co-defendants that they had the right to testify. The circuit court explained this right as follows:

THE COURT: ... The law requires I speak to you directly about a particular matter so you are aware. It is about a right that you have under the law that I need to make sure that you know that you have, and that's your right to testify in this trial.

I don't know if you are planning on testifying, any of you, but you have a constitutional right to testify in this trial in your own defense. Although you should consult with your lawyer regarding your decision to testify, it is your decision and no one can prevent you from testifying if you choose to do so.

If you should decide to testify in this trial, the Prosecutor will be allowed to cross-examine you. You also have a constitutional right not to testify in this trial and to remain silent. If you choose not to testify, I will instruct the jury that it cannot hold your silence against you in deciding your case.

If you have not testified by the end of the trial, I'll again question you briefly to make sure that it was your individual decision not to testify.

Do you have any questions bought [sic] that, anybody? Okay, thank you.

None of the defendants nor their attorneys said that the defendants would or would not testify. When Akahi presented his case after the State had rested, he submitted only two stipulations and then rested. At that time, the circuit court did not question him regarding his right to testify.

The only other questioning by the circuit court of the defendants occurred when it was Kaahanui's turn to present his case. Although Akahi had already rested his case, the circuit court addressed both Akahi and Kaahanui and explained to both of them about their right to testify. Kaahanui's attorney advised the court that Kaahanui opted not to testify. Neither Akahi nor his attorney made any response.

Pointing to Akahi's silence when the circuit court initially explained the right to testify and asked if there were any questions, Akahi's failure to present any evidence other than the two stipulations,[10] and Akahi's silence when the circuit court again questioned him and Kaahanui regarding their right to testify, the State argues that, with respect to Akahi, "[a] review of the record in this case demonstrates that Mr. Akahi knowingly and voluntarily acquiesced, to a waiver of his right to testify."

Various jurisdictions have taken various approaches to the question of a defendant's being aware of and waiving his or her constitutional right to testify. *See* Annotation, *Necessity That Waiver of Accused's Right to Testify in Own Behalf Be on the Record,* 90 A.L.R.4th 586 (1991) (hereinafter *Right to Testify,* 90 A.L.R.4th).

In *Tachibana,* the Hawai'i Supreme Court clearly rejected (1) the demand approach and (2) the post-trial challenge approach.

The demand approach states that "a defendant who fails to complain about the right to testify during trial is conclusively presumed

---

10. *See infra* note 12.

to have waived that right. Courts using the demand rule will not entertain a post-trial challenge based on the right to testify." *Tachibana*, 79 Hawai'i at 233, 900 P.2d at 1300. The Hawai'i Supreme Court rejected the demand approach for the reason that "the demand rule requires a defendant to assert a right of which the defendant may not be aware by objecting in a manner the defendant has been told is inappropriate. We decline to adopt a rule which places such burdens on the exercise of a fundamental constitutional right." *Id.* at 234, 900 P.2d at 1301.

The post-trial challenge approach states that

> a trial judge need not *sua sponte* question the defendant during the trial, but the defendant is free to bring a post-conviction challenge based on a denial of the right to testify. To prevail in such a challenge, the defendant must demonstrate that he or she did not knowingly waive the right to testify at trial.

*Id.* at 233, 900 P.2d at 1300.

The *Tachibana* court rejected the post-trial challenge approach because "if the [trial] court does not establish on the record that the defendant has waived his [or her] right to testify, it is extremely difficult to determine at a post-conviction relief hearing whether such a waiver occurred." *Id.* at 234, 900 P.2d at 1301.

A third approach is the "colloquy" approach which requires that the

> trial judge in a criminal prosecution must conduct a colloquy with the defendant on the record establishing that the defendant is aware of his [or her] constitutional right to testify in his [or her] own behalf and that the defendant's waiver of that right, if any, is voluntarily, intentionally, and knowingly made.

*Right to Testify*, 90 A.L.R.4th at 588–89; *see People v. Curtis*, 681 P.2d 504 (Colo.1984).

In this appeal, we need not decide whether the difference between the *Tachibana* language and the colloquy approach language quoted above was an intentional modification by the *Tachibana* court of the colloquy approach language quoted above because it is undisputed that the trial court failed to perform its *Tachibana* duty.

■ In this appeal, the State argues that it proves that the trial court's failure to perform its *Tachibana* duty is harmless beyond a reasonable doubt in those situations where the record shows that the defendant knowingly and voluntarily waived his or her right to testify. The State goes so far as to argue for the imposition of a burden on the defendant if and when the State shows that the facts on record satisfy the elements of a prima facie waiver. We conclude that *Tachibana* requires the rejection of the State's arguments. We further conclude that the only way for the State to avoid the consequences of the trial court's failure to perform its *Tachibana* duty is to prove that the error was harmless beyond a reasonable doubt. The entire burden of showing harmlessness beyond a reasonable doubt is on the State. The defendant has no burden whatsoever in this regard.

Count One (Criminal Trespass Second), Count Two (Escape Second), and Count Three (Hindering Prosecution Second) pertain to an incident involving Akahi, Kaahanui, Grace, and the police on up-country land above 'Ulupalakua in Kanaio on October 24, 1997. Count Four (Terroristic Threatening First) and Count Five (Assault Against a Police Officer) pertain to an incident involving Grace and the police at the Maui Mall on November 3, 1997. This appeal by Akahi and Kaahanui pertains only to Counts One, Two, and Three.

Police Officer Frank K. Kuamoo, II (Officer Kuamoo), testified in relevant part as follows:

> Q. Officer, what was your specific assignment on October 24th, 1997, at six p.m.?
>
> . . . .
>
> A. To go up to property in [the] Kanaio area to check for James Akahi and see if he's trespassing and have him leave [the] premises or place him under arrest.
>
> . . . .
>
> A. Mr. Akahi came out of the property to greet us.
>
> . . . .

A.   Basically, [I] told him we were assigned to come here and escort him off the property.

. . . .

Q.   What did Mr. Akahi tell you in response?

A.   That he would not leave and instead he would have to be placed under arrest.

. . . .

A.   I placed him—my handcuffs on him, informed him he was under arrest.

. . . .

Q.   Now, what happened when you tried to place Mr. Akahi inside the vehicle that you described?

A.   The individual identified as Grace Akahi again [sic] pulling on his free arm stating that we needed to stop and that she is going to have a photograph taken first.

. . . .

A.   Then, she was joined by Terry Kaahanui and another male I couldn't identify who he was.  They also began tugging on Mr. Akahi's arm.

. . . .

Q.   Now, at one point . . . was Mr. Akahi pulled from your grasp?

A.   Yes.

Q.   What happened next?

A.   Then, they all went—Mr. Akahi went into the land itself through that little makeshift gate and Terry Kaahanui and Grace Akahi stood there at the entrance to the gate, and there were several other people on the land that started to come to the gate.

. . . .

A.   [Akahi] went into the property, itself, and by then I couldn't see where he went after he passed the gate because all these people were standing there.

. . . .

Q.   Did you try to go onto the property after Mr. Akahi?

A.   Well, seeing as the numbers that they had and the little tug of war match that we had, at first I tried to get [on] our police radio and our cellular phone.  There was no contact with anybody else around, so we left the area.

. . . .

Q.   And how would you describe the mood of the individuals as you were trying to reach dispatch?

A.   It was hostile, like I said, during the tug of war and I believe if we went after him, it could have got worse.

The record shows that Grace was the only co-defendant who testified and the only defense witness presented for any of the co-defendants.[11]  Relevant portions of her testimony are as follows:

Q.   How are you familiar with that piece of land up in Ulupalakua ['Ulupalakua]?

A.   We always go there because of the burial site.

Q.   When you say we always go there, who is we?

A.   My husband [Akahi] and I and my grandchildren and my children and family relatives.

. . . .

Q.   . . . [W]hat did you go to the gravesite [sic] for?

A.   For taking—going there taking our children there to do prayers, chanting and taking gifts to the gravesite [sic].

. . . .

Q.   Why do you do that?

A.   It is a part of our culture and traditions and customary to respect the ancestors.

Q.   Whose ancestors are you doing this for at that gravesite [sic]?

A.   [Akahi], my husband.

Q.   How long have you been doing that with your husband and children and grandchildren?

---

11.   The only evidence Akahi presented in his case were two stipulations.  The first stipulation was that "visiting, attending to and showing respect for those buried in a gravesite [sic] is a legitimate, customary and traditional Hawaiian practice."  The second stipulation read, "James Kimo Akahi is a descendent of native Hawaiians who inhabited the Island of Hawaii [Hawai'i] prior to 1778."  Kaahanui did not present any evidence.

A. I would say close to seventeen years.

. . . .

Q. Were you living on that property [on] October 24, 1997?

A. No.

. . . .

Q. Did [the grave site] always have the rock wall around it in the seventeen years you have been attending to it?

A. No. There was—it was like a cave that was there.

Q. Did you folks do the rock wall?

. . . .

A. Due to the damages that had some cattle going over it, we put the rock wall around it.

Grace then testified about the arrest of her husband on October 24, 1997, and the events that occurred surrounding the arrest.

A. [Akahi] approaches [the police officers]. [Akahi] asks us who they are. [The officers] do not respond to who they were, but they did remove themselves from the vehicle and handcuffed him, manhandling him and grabbing him and putting his arms—the handcuffs on him.

Q. How did they do that, specifically?

A. His hands [were] behind. They put the handcuffs on him and shoved him toward the car, the four-wheel Isuzu.

. . . .

Q. What happens next?

A. I asked—I grabbed my husband and I asked the officer, "Can I take photos?" They said, "Yeah, go ahead. You can take all the photos you want." So I started snapping pictures as they were manhandling him.

. . . .

Q. You stated you grabbed somebody's arm as you asked for permission to take photographs?

A. Yes.

Q. Who did you grab and how?

A. My husband to stop and ask if I could ask the officers if it was okay if I could start taking photos.

Q. How long did you grab your husband's arm?

A. Let's see, about twenty seconds or so until they approached and I started taking the pictures.

Q. When you grabbed [Akahi's] arm, did you do so for any purpose other than to ask permission to take photographs?

A. Just to take pictures.

. . . .

Q. What happens next, Grace?

A. Then, they're up at the gate at this point.

Q. When you say they're up at the gate, who is up at the gate?

A. The three officers holding onto the two arms of [Akahi]. One officer on each end. Rodrigues is in front of him and then he went over into the gate side inside the gravesite [sic] area on the opposite side of the gate.

Q. Who went over into the—

A. [Akahi].

Q. How did that happen?

A. A person pushed—pulled him over.

Q. How?

A. Around his chest.

Q. You have to describe how that person pulled [Akahi] over?

A. Placed his arm over around his chest and pulled him back.

Q. From the front or—

A. From the back.

Q. What happens next?

A. Then, the officers releases [sic] their hand[s] off of [Akahi]. Officer Rojas goes onto his cell[ular] phone, puts it up into his ear, and he was calling. I don't know. He was just on the cell[ular] phone trying to call.

. . . .

Q. Did you, Grace, have anything at all to do with [Akahi] leaving these three people that we know as police officers and going to the gravesite [sic]?

A. No. I just was taking photos, just was taking pictures.

Q. What happens next?

A. They leave and we waited and no one did never [sic] came [sic] back.

Q. Where was [Akahi] waiting?

A. In the gravesite [sic].

Q. Still handcuffed?

A. Still handcuffed.

Q. How long did you folks wait?

A. Oh, it was really dark at that point already. It was like around nine-thirty, ten that evening.

During cross-examination by Kaahanui's defense counsel, Grace testified as follows:

Q. You testified earlier about the events that took place up at the land up in Kanaio, and during that testimony you mentioned that at one point some person actually picked up your husband and carried him back up on to the property?

A. Yes.

Q. That person was not Terry Kaahanui, was it?

A. No. It was not.

Q. And at any time there that day did you see Terry Kaahanui physically grab ahold [sic] of your husband and pull him away from the police?

A. No.

Grace was then questioned regarding her recognition of what was depicted in State's Exhibit No. 10, and she testified as follows:

A. That's the entrance gate to the gravesite [sic].

Q. Now, in by the entrance gate is that the gate that goes from the roadway onto the parcel of land that the gravesite [sic] is on?

A. Yes.

Q. Is that the gate area people were going in and out of during this confrontation with the three people that came up in the Isuzu?

A. Yes.

Q. In the picture this gate appears to be completely closed?

A. Yes.

Q. On that day, that afternoon, was the gate closed or was it open?

A. It was actually closed before the officers or whatever came there.

Q. And then in order to get through this gate how do you open the gate?

A. There's a chain and a lock on it.

Q. And the gate itself, does it swing open or does it simply collapse?

A. Collapse.

. . . .

Q. It is essentially like fence wire then that is held taut when it is closed?[12]

A. Yes.

Q. So was it open that you testified earlier one individual went out to inquire as to what these people wanted?

A. That's correct.

Q. Was it then that the gate was open?

A. Yes.

Q. Did it remain open then throughout the rest of the time until the time the police officers left?

A. Yes.

Under cross-examination by the Deputy Prosecuting Attorney (DPA), Grace then testified further regarding the gate.

Q. [Kaahanui's defense counsel] asked you some questions about a gate which fronts this property. I assume that gate is open to visit the site that you have described?

A. Yes.

Q. Who has the key to that lock you described?

A. [Akahi] does.

. . . .

Q. So your husband has control over that gate to that property?

A. Well, yes.

. . . .

Q. There [was] also a sign placed on this property, was there not?[13]

12. Frances Peiler, one of the record title property owners of this parcel of land testified that a prior lessee of this parcel, Harold Makimoto, put up a wire fence around the whole property. She further testified that there should not be any existing permanent structures on the property.

13. State's Exhibit No. 9 is a picture of the sign which states, "Kingdom of Hawaii 'KAPU' Under

A. Yes.

Q. The sign that read kapu[14]?

A. Yes.

Q. Who placed that sign on the property?

. . . .

A. [Akahi].

Regarding Akahi's escape, Grace testified on cross-examination as follows:

Q. And someone pulled him over the gate as you told us yesterday?

A. Yes.

Q. And Mr. Akahi moved up into the property at that point?

A. As the person pulled him over, lifted and pulled him over, the officers just let him go, the left side and the right side. Both Officer Rojas and Officer Kuamoo just let him go and they watched him after that walk and the crying of the children— they all walked with him toward the gravesite [sic], and Officer Rojas stood at their post of the gate and just watched them go and Officer Kuamoo on the other side of the gate stated, "my handcuffs."

. . . .

Q. [Akahi] moved away from the officers?

A. He walked as the children came near him.

Grace was then questioned by Akahi's defense counsel and testified as follows concerning the events on October 24, 1997.

Q. On the 24th of October when the police officers arrived at the property, you have testified that they approached one of the [sic] your compatriots up there and asked for [Akahi], is that correct?

A. Yes.

Q. And [Akahi] went down to where the police [were], is that correct?

A. Yes. He left the gravesite [sic] and went down.

Q. And he was told that he was going to be placed under arrest. Did you hear that?

A. Yes, that he was going to be put under arrest.

Q. Then, he voluntarily turned his back to the police and put his hands behind his back, is that correct?

A. Yes.

Q. And the handcuffs were put on him, is that correct?

A. Yes.

. . . .

Q. And [Akahi] did not resist?

A. No.

Q. [Akahi] did not attempt to get away?

A. No.

Q. [Akahi] did not—[Akahi] pulled away by somebody else, right?

A. Yes.

Q. And then what, he was sort of in a tug of war with the police and these other people?

A. Yes. Yes, he was pulled.

Q. And then the police let go of [Akahi]?

A. Yes.

Q. And then [Akahi] walked over onto the property and stood there?

A. Yes.

Q. He didn't run away?

A. No.

Q. And during this period of time the police officers got on their cell[ular] phone and tried to use the radio, is that right?

A. Yes.

Q. Then, the police left?

A. Yes.

Q. All right, and then [Akahi] hung out on the property, is that right?

A. That's correct.

Q. He went up to the gravesite [sic]?

violations & penalities [sic] of genocide, human rights, incitement offense, Article 73, International Law, Proxmire Act, U.S.P.L. 100–606, U.S.P.L. 103–150. Authorized by: Majesty Akahi Nui."

14. "Kapu" is a Hawaiian word which means "[t]aboo, prohibition; special privilege or exemption from ordinary taboo; sacredness; prohibited, forbidden; sacred, holy consecrated; no trespassing, keep out." M.K. Pukui and S. Elbert, *Hawaiian Dictionary* 132 (1986).

A. Yes.

Q. And he waited around for the police to come back?

A. Yes.

Q. Did the police come back?

A. No.

The trial judge instructed the jury in relevant part as follows:

It is a defense to Trespass if defendant James Kimo Akahi was present on the property engaging in a reasonable exercise of customary and traditional Hawaiian cultural or religious practices. In order for this defense to apply, you must find the following:

1. Defendant James Kimo Akahi is a descendant of native Hawaiians who inhabited the islands prior to 1778, in any blood quantum;

2. Defendant was engaged in a legitimate, customary and traditional Hawaiian practice;

3. The property is less than fully developed; and

4. His exercise was reasonable and caused no harm to the property.

[ ]This defense does not extend to the right to perpetual and exclusive occupancy upon the property.

[ ]The State of Hawaii [Hawaiʻi] and defendant James Kimo Akahi have stipulated that:

1. Visiting, tending to, and showing respect for those buried in a gravesite [sic] is a legitimate, customary and traditional Hawaiian practice;

2. James Kimo Akahi is a descendant of native Hawaiians who inhabited the islands of Hawaii [Hawaiʻi] prior to 1778.

In closing argument to the jury, the DPA stated in relevant part as follows:

The evidence has shown you that the defendant, James Akahi, absolutely believes that this piece of land belongs to him to the exclusion of the land and title holders, . . . .

The evidence has shown that on October 24th, 1997, James Kimo Akahi absolutely believed that the police had no right to take him into custody when, after being pulled away from Officers [sic] Kuamoo, Sergeant Rojas, and Officer Howard Rodrigues, he ran from police custody by getting free and getting clear away from the gate and away from the officers while he was handcuffed.

The evidence has further shown that the defendants, Grace Akahi and Terry Kaahanui, absolutely believed on October 24th, 1997 that they could aid and assist Mr. Akahi by pulling him away from the arresting officers, and with the assistance of unnamed others they absolutely believed that they could keep the police from entering onto the property to retake Mr. Akahi into police custody.

. . . .

In 1992 you heard about the writ of possession which was served on the defendant. The writ of possession . . . basically ordered . . . James Akahi, to remain off the property.

. . . .

This case is not about visiting and tending to graves. The Halemanos, as you heard, were very reasonable people. They have never been approached about this issue. It's not a confirmed grave site. They would be more than reasonable and they would more than allow the defendant to come onto the property to visit these graves, as they indicated to you.[15]

15. Lance Halemano testified in relevant part as follows:

Q. (By [the Deputy Prosecuting Attorney (the DPA)] the attorney for the State) Now, Mr. Halemano, have you ever had knowledge of a gravesite [sic] on this particular piece of property?

. . . .

A. I know that Mr. Makimoto, who was our former lessee and neighbor, showed the gravesite [sic] to my dad and my aunt on their last visit here, and the only other knowledge I have is that no one knows who is buried there or that there truly is a grave. It is just word of mouth.

. . . .

Q. (By [the DPA]) Mr. Halemano, what is your intention—what is your family's intention with respect to this particular piece of property?

A. We want to sell it.

In closing argument to the jury, counsel for Akahi argued that: (1) Akahi was merely engaging in a reasonable exercise of customary and traditional Hawaiian cultural or religious practices; and (2) "[Akahi] did not do anything to pull himself away," Akahi was "the rope in a tug of war" and, after he was pulled away, Akahi merely went back to the grave site and waited for the police.

In closing argument to the jury, counsel for Grace stated in relevant part as follows: "What is this case about, ladies and gentlemen? It's about the police version of what occurred up at the land ... versus Grace Akahi's version of what occurred at the land[.]"

In closing argument to the jury, counsel for Kaahanui argued in relevant part as follows:

Now we are in ... late '97 when this case actually happened, and here is Mr. Akahi on the property, and he is not there alone. He's with his extended family, his wife, all these other people that are up there. The children, his grandchildren, his moopuna [moʻopuna].[16] And what is he doing there? You might think, well, my goodness. We have a court order saying he is off the property. He is on the property. Case closed. Well, it's not that simple.

What James Akahi, Grace Akahi, Terry Kaahanui and all the other people were doing up there that day is something that is in fact protected by the law. What they were doing was caring for the graves of Halemano and Muolo, people who were buried up there many generations ago.

. . . .

So [Akahi] came down there to where the gate was, and these police officers tell him, "Leave. Just leave. We're not even going to arrest you if you just leave."

Well, as [counsel for Akahi] said, there is a time when you have to draw a line in the sand, and what James Akahi and Grace Akahi and Terry Kaahanui and presumably everybody else up there knew that day was that they had the right to be there.

And what did James Akahi do? Did he run mauka[[17]], head up the mountain, disappear? No. He went to that gravesite [sic], because by gosh, if he was going to be arrested that day he was going to be arrested right there on those graves, because he knew he was right. He knew he had the right to be there, and this was more a political statement, if you will, a cultural statement, than anything else.

. . . .

I would submit to you that there was no escape that day. What there was was a drawing of a line and saying to the police officers, "Look, you folks cannot come up here and just tell me 'Get out of here or you will be arrested' because what I am doing here is protected and it's right, and if you're going to arrest me, then do it as I stand here, standing on the graves of my ancestors."

. . . .

You are going to see a picture. There is what appears to be a little outhouse constructed there. The doors open, there is a toilet sitting there, so there is a facility for people to use up there. None of this adds up to anything more than the rightful exercise of the customary Hawaiian practice.

These are people that go to an isolated area out there, it sounds like typically on the weekends. In fact, that's what Grace

Q. And if the property is sold, what is ... your family's intention with respect to what's suspected to be a gravesite [sic] on that property?
A. Our intention on how the new buyers?
Q. Yes.
A. We have discussed that. We have never intended for them to not have access. So it would be a provision in there that they do have access to pay their respects and tend to the graves.
Q. By them, are you referring to Mr. Akahi and his family?

A. Anyone that wants to show respect to who they might think is in there, yeah.

16. "Moʻopuna" is a Hawaiian word meaning "[g]randchild; great-niece or nephew; relatives two generations later, whether blood or adopted; descendant; posterity." M.K. Pukui and S. Elbert, *Hawaiian Dictionary* 254 (1986).

17. "Mauka" is a Hawaiian directional term meaning inland" M.K. Pukui and S. Elbert, *Hawaiian Dictionary* 242 (1986).

testified to. And what are they supposed to do? Just run off over the hill somewhere when they have to go to the bathroom? They put in a place where everybody can use a toilet.

There is no evidence that they are telling other people to leave the property. There is no evidence they are preventing anybody else from doing anything they want up there.

The kapu[18] sign, Grace said what that word means to her is to protect. You don't have to live in these islands very long to discover the kapu is used in a variety of contexts, but certainly to put the word "kapu" around gravesites [sic] is nothing unusual. There are other cemeteries and graveyards around with that same designation.

Kapu is not saying "Everybody stay out." Kapu is saying "There is something protected here. There is something special here. Watch what you're doing."

. . . .

What happened here, ladies and gentlemen, was to some extent a confrontation. It was people who were standing up not only for what they believe, but for what is right and what is protected under the law.

In rebuttal, the DPA stated in relevant part as follows:

James Akahi does not want to just visit this property and tend graves; he wants all of it. He wants to control it.

. . . .

"If his exercise of these rights was reasonable under the circumstances and caused no actual harm to the property. This defense does not extend to the right to perpetual and exclusive occupancy upon the property."

This is where the issue is, right here. When you consider that part of the instruction, ask yourself who put up the chain across the property? Who put a lock on that chain? Who controls the key to that lock? Who put up this sign? Who do these belong to (indicating)? Who put these shelters up? Grace Akahi unequivo-cally stated that it was her husband, James Kimo Akahi.

. . . .

Consider that, ladies and gentlemen. Who put the chain up? Who put the lock on it. Who put the sign up? Who put the structures on it? Who put the vehicles on it?

In *State v. Silva*, 78 Hawai'i 115, 890 P.2d 702 (App.1995), this court held that the denial of the defendant's right to testify was prejudicial and not harmless beyond a reasonable doubt. But Silva's conviction was based essentially on the uncontroverted testimony of a complaining witness, and the record did not indicate what Silva's testimony would have been. *Silva*, 78 Hawai'i at 126, 890 P.2d at 713. As a result, this court decided that "[i]t is impossible to conclude, beyond a reasonable doubt, that [Silva]'s testimony could not have created a reasonable doubt in the mind of the factfinder and, hence, that the error could not have contributed to the conviction." *Id.*

■ In the instant case, after the court twice explained to Akahi and Kaahanui their right to testify, Kaahanui's attorney advised the court that Kaahanui opted not to testify. Kaahanui and Akahi did not respond personally to the court. A co-defendant, who was also Akahi's wife and who was personally present at all relevant times, testified extensively about the events which resulted in the charges against all three of the co-defendants. Her testimony contradicted the testimony offered by the State's witnesses in many areas concerning the charges against both Akahi and Kaahanui and supported their asserted defenses.

In *Commonwealth v. Dranka*, 46 Mass. App.Ct. 38, 702 N.E.2d 1192 (1998), the court was presented with a case that was a "duel of credibility" between the complainant and the defendant. In *Dranka*, the trial court excluded the testimony of a material defense witness as a sanction. The testimony of this witness would have corroborated the defendant's testimony. The court concluded that, as a result of the lack of this corroborative testimony, there was a reasonable possibility

---

18. *See supra, note 14.*

that the error of excluding this testimony might have contributed to the defendant's conviction. *Dranka*, 702 N.E.2d at 1196. Therefore, the defendant's convictions were reversed. *Id.*

In this case, the decisive issue was credibility. As noted by counsel for Grace in closing argument, the jury had to decide between "the police version of what occurred up at the land ... versus Grace Akahi's version of what occurred at the land[.]" We conclude that it cannot be said beyond a reasonable doubt that, if Akahi's and/or Kaahanui's voices had been added to Grace's version of what occurred at the land, the jury's decision would not have been different.

## CONCLUSION

Accordingly, we affirm the circuit court's May 28, 1998 Order Granting Motion for New Trial.