6 P.3d 385

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Philip GRAYBEARD, Defendant–Appellant.**

**No. 22506.**

Intermediate Court of Appeals of Hawai'i.

July 28, 2000.

Shirley M. Kawamura, Deputy Public Defender, on the briefs, for defendant-appellant.

Tharrington T. Trusdell, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

Defendant–Appellant Philip Graybeard, aka Graybeard,[1] appeals the May 14, 1999 judgment of the District Court of the Third Circuit convicting him of harassment, in violation of Hawai'i Revised Statutes (HRS) § 711–1106(1)(b),[2] and sentencing him to perform two hundred hours of community service and to pay twenty-five dollars to the Criminal Injury Compensation Fund. Because the court did not engage Graybeard in the so-called *Tachibana*[3] colloquy or obtain on the record his waiver of his constitutional right to testify at trial, we vacate the judgment and remand for a new trial.

### Jurisdictional Issues.

Graybeard's Notice of Appeal, filed in the Puna division of the District Court of the Third Circuit on May 14, 1999, at 11:00 a.m., appealed from "the Judgment and Sentence, entered on April 19, 1999 by Judge ... and recorded on the Court Calendar on that same date." In its caption, the notice of appeal referenced "Report No. F–49767/PN[,]" the name of the judge and an April 19, 1999 trial date.

---

1. The surname of Defendant–Appellant is spelled "Graybeard" in some filings and "Greybeard" in others. His own attorneys utilize the former at times and the latter at other times, apparently willy-nilly. To simplify matters in this opinion, and for want of any information in the record about what Defendant–Appellant regards as the correct spelling, we will adopt the "Graybeard" spelling used in the complaint.

2. Hawai'i Revised Statutes § 711–1106(1)(b) (Supp.1999) provides, in pertinent part, that "[a] person commits the offense of harassment if,

with intent to harass, annoy, or alarm another person, that person ... [i]nsults, taunts, or challenges another person in a manner likely to provoke an immediate violent response or that would cause the other person to reasonably believe that the actor intends to cause bodily injury to the recipient or another or damage to the property of the recipient or another[.]"

3. *Tachibana v. State*, 79 Hawai'i 226, 900 P.2d 1293 (1995).

The record on appeal, which contains the original court file, does not contain a "Court Calendar" nor any record of a "Judgment and Sentence" recorded thereon.

What the original court file does contain, however, is a Judgment filed in the Puna Division of the District Court of the Third Circuit on May 14, 1999, at 12:26 p.m.

The filed judgment is a one-page, preprinted court form. In its caption, the name of the division and the names of the parties are typed into the appropriate spaces provided. The number "F–49767" is typed into the space provided for "CRIMINAL NO." The number "711–1106" is typed into the intermediary space provided by the phrase, "Violation of Section _____ Hawaii Revised Statutes, as amended[.]" The word "HARASSMENT" is typed into the space situate above the word "Offense[.]"

Then, under the title "JUDGMENT" is the following body of the document, with the italics supplied indicating the portions typed into spaces provided by the preprinted form: "I HEREBY CERTIFY that on the *19th* day of *April, 1999,* in the above entitled cause, the District Judge of the above entitled court *sentenced the above-named defendant as follows: 200 hours community service work; Criminal Injury Compensation Fund $25.00* [.]" The form is dated May 14, 1999, signed by the clerk of the court and embossed with the court seal.

■ Neither party raises any jurisdictional issues in this appeal. An appellate court has, however, an independent obligation to ensure jurisdiction over each case and to dismiss the appeal *sua sponte* if a jurisdictional defect exists. *Bacon v. Karlin,* 68 Haw. 648, 650, 727 P.2d 1127, 1129 (1986).

■ "The right of appeal is had only when granted by constitutional or statutory provision." *Security Pacific Mortg. Corp. v. Miller,* 71 Haw. 65, 68, 783 P.2d 855, 857 (1989) (citation omitted).

HRS § 641–12 (1993) provides that "[a]ppeals upon the record shall be allowed from all final decisions and final judgments of district courts in all criminal matters. Such appeals may be made to the supreme court, subject to chapter 602 whenever the party

appealing shall file notice of the party's appeal within thirty days, or such other time as may be provided by the rules of the court."

■ Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(b) (1999) provides, in part, that "[i]n a criminal case, whether the appeal is one of right or is an interlocutory appeal, the notice of appeal by a defendant shall be filed in the circuit or district court within 30 days after the entry of the judgment or order appealed from." An appellant's failure to file a timely notice of appeal is a jurisdictional defect which cannot be waived by the parties or disregarded by the court in the exercise of its discretion. *Bacon,* 68 Haw. at 650, 727 P.2d at 1129.

HRAP Rule 3(c) (1999) provides, in pertinent part, that "[t]he notice of appeal ... shall designate the judgment, order or part thereof appealed from."

■ With respect to jurisdiction, we first observe that Graybeard's notice of appeal designated an apparently nonexistent judgment.

The designation requirement is not, however, jurisdictional. "Professor Moore states that 'a mistake in designating the judgment ... should not result in loss of the appeal as long as the intention to appeal from a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake.'" *City & County v. Midkiff,* 57 Haw. 273, 275–76, 554 P.2d 233, 235 (1976) (citation omitted).

It can be fairly inferred from Graybeard's notice of appeal that he is appealing from the only extant judgment in criminal number F–49767, which is the judgment filed May 14, 1999. The State was not in any wise misled by the incorrect designation. On appeal, it argues in all respects as if Graybeard had designated the filed judgment.

■ We next observe that Graybeard's notice of appeal was filed on the same day but before the judgment filed by the court. This irregularity is also not fatal. HRAP Rule 4(b) (1999) provides, in relevant part, that with respect to an appeal by a defendant in a criminal case, "[a] notice of appeal filed after

the announcement of a decision, sentence or order but before entry of the judgment or order shall be treated as filed after such entry and on the day thereof. . . . A judgment or order is entered within the meaning of this subdivision when it is filed with the clerk of the court." *See, e.g., Grattafiori v. State,* 79 Hawai'i 10, 13, 897 P.2d 937, 940 (1995)("pursuant to HRAP Rule 4(b), an appeal . . . must either be filed within thirty days after the entry of the order . . . or, in the alternative, after the announcement but before the entry of the order").

As will be detailed below, the court announced Graybeard's conviction and sentence at the conclusion of Graybeard's bench trial on April 19, 1999. The judgment was filed May 14, 1999, at 12:26 p.m. Graybeard's notice of appeal was filed the same day, but earlier at 11:00 a.m. The foregoing authorities deem the notice of appeal to be filed the same day as and after the judgment. By the same token, the notice of appeal was timely. HRS § 641–12; HRAP Rule 4(b).

■ Graybeard's counsel may have drafted and filed the notice of appeal as he did because of certain assumptions gleaned from Hawai'i Rules of Penal Procedure (HRPP) Rule 32(c)(2) (1999), which specifies that "[t]he notation of the judgment by the clerk on the calendar constitutes the entry of the judgment." *See also State v. Nishi,* 9 Haw. App. 516, 526, 852 P.2d 476, 481 (1993)("[w]hile a circuit court judgment generally is a one-page document, a district court judgment consists of the clerk's notation on the court's daily calendar containing numerous cases") (citing HRPP Rule 32(c)(2)).

Which begs, however, the further question whether appealing from the filed judgment, which is not in the form specified by HRPP Rule 32(c)(2), constituted a jurisdictional defect. Though we view as jurisdictionally insignificant the incorrect designation of the judgment in the notice of appeal, the divaga-

tion of the form of the judgment from that specified in the rule raises the threshold question whether an appealable final judgment was at all entered in this case. *See, e.g., State v. Bulgo,* 45 Haw. 501, 502–4, 370 P.2d 480, 481–82 (1962) (no appellate jurisdiction over State's appeal from an oral order of the circuit court dismissing criminal indictments because the oral order was not a document in writing and thus, under court rules then existing, was not an appealable judgment or order; note that in the case of an appeal by the State in a criminal case, the court rules then did not provide that an appeal filed between court announcement and filing of judgment is deemed filed on the same day and after the filing of the judgment [4]).

We do not believe we have an analogue of the *Bulgo* situation in this case. HRPP Rule 32(c)(2) (1999) provides:

A judgment of conviction in the district court shall set forth the disposition of proceedings and the same shall be entered on the record of the court. The notation of the judgment by the clerk on the calendar constitutes the entry of the judgment.

The subsection does not expressly limit the method of entry of judgment in the district court to the court clerk's notation on the court calendar. It should not imply such a limitation either, because excluding the method of entry of judgment utilized in this case also excludes the potential for more detail and clarity in the exposition of the judgment.

The simple expedient permitted by HRPP Rule 32(c)(2) subserves, we surmise, the goal of efficiency in a court that carries a multitude of cases. We can conceive of no good reason, however, for investing it as the sole and exclusive method of entering judgment in the district court. Efficiency need not and should not be purchased at the expense of other virtues, such as expository range.

HRAP Rule 4(b) (1999), moreover, appears to sanction the kind of judgment filed in this

---

4. Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(b)(4) (2000), promulgated by amendment filed on December 6, 1999 and effective January 1, 2000, provides that in criminal cases, "[a] notice of appeal filed after the announcement of a decision, or order but before entry of the judg-

ment or order shall be deemed to have been filed on the date such judgment or order is entered." Unlike earlier versions of HRAP Rule 4(b), this provision applies not only to the notice of appeal by a defendant in a criminal case, but to the notice of appeal by the State in a criminal case.

case. That rule provides that the notice of appeal by a defendant in a criminal case "shall be filed in the ... district ... court within 30 days after the entry of the judgment or order appealed from." The rule further provides that "[a] judgment or order is entered within the meaning of this subsection when it is filed with the clerk of the court." The district court calendars, to the extent that they are filed at all, are not filed in any manner that is usually understood as "filing." The judgment in this case was.[5]

We believe, therefore, that the form of the judgment in this case raises no jurisdictional concerns.

■ We discern in the substance of the judgment one final jurisdictional issue. The judgment details the sentence meted out to Graybeard, and the criminal offense involved, but nowhere expressly states that Graybeard was convicted of the offense.

Though it has been held that an appealable judgment is one consisting of both a conviction and a sentence, *State v. Ferreira*, 54 Haw. 485, 486–88, 510 P.2d 88, 89 (1973), that holding and the court rule that actuated it applied to appeals from the circuit court.

The court rule relied upon by the supreme court in *Ferreira*, now HRPP Rule 32(c)(1) (1999), provides that "[a] judgment of conviction in the circuit court shall set forth the plea, the verdict or findings, and the adjudication and sentence." However, its counterpart applicable to the district court, HRPP Rule 32(c)(2) (1999), provides only that "[a] judgment of conviction in the district court shall set forth the disposition of the proceedings and the same shall be entered on the record of the court." We deem the difference significant.

The judgment in this case set forth the criminal offense and the sentence. The only inference possible is that Graybeard was convicted of the offense and sentenced for the offense. We do not discern any jurisdictional defect in the judgment's lack of an expression of conviction.

With respect to the jurisdictional issues we have raised relating to HRPP Rule 32(c), it should be remembered as a general matter that "Rule 32(c) is a rule of procedure and not of substance. Its primary purpose is to fix the time for appeal." *State v. Akana*, 68 Haw. 164, 166, 706 P.2d 1300, 1303 (1985) (holding that HRPP Rule 32(c)(1) is inapplicable to the issue whether a defendant's probation can be revoked for a felony of which the defendant was convicted but for which he was not sentenced).

In any event, our appellate courts have ignored formal jurisdictional defects that are due to the derelictions of a criminal defendant's attorney. *State v. Knight*, 80 Hawai‘i 318, 323–24, 909 P.2d 1133, 1138–39 (1996) ("[appellant], as a criminal defendant, is entitled, on his first appeal, to effective counsel who may not deprive him of his appeal by failure to comply with procedural rules"); *State v. Ahlo*, 79 Hawai‘i 385, 391–92, 903 P.2d 690, 696–97 (1995) (where criminal defendant's attorney filed his notice of appeal eighteen days late, dismissing his appeal for lack of jurisdiction "would lead to harsh and unjust results[,]" so we heard the appeal "in the interest of justice"). *See also Grattafiori*, 79 Hawai‘i at 13–14, 897 P.2d at 940–41.

Our indulgence should apply *a fortiori* in a case like this, where the jurisdictional issues originated from irregular court practice and defense counsel's apparent assumption that the court would adhere to its own rules.

We conclude, finally, that we have jurisdiction to hear this case.

---

5. In light of the continuing conflict between HRAP Rule 4(b) (2000) and Hawai‘i Rules of Penal Procedure (HRPP) Rule 32(c)(2) (2000), we strongly recommend that HRPP Rule 32(c)(2) be amended to expressly recognize a separate, filed judgment as the entry of judgment in the district courts, either as an alternative to the clerk's notation of the judgment on the court calendar or as the sole and exclusive method of entry of judgment. We prefer the latter because of the greater detail and clarity afforded by a separate judgment and the virtues of consistency among the circuits. The practical problems posed by requiring the filing of a separate judgment in each case on a crowded district court calendar may be alleviated by expedients already in place in other courts; for example, the choose-and-check-the-box orders now employed in the family court of the first circuit.

## Background.

At the April 19, 1999 bench trial, the State's first witness was the complaining witness, Jose Martinez (Martinez). He testified about the events of January 17, 1998.

During the afternoon of that day, Martinez and his wife were picking beans on his organic bean farm in the Kalapana Seaview Estates. The order for forty pounds of beans had kept them picking for five hours.

As Martinez returned to the front part of his farm from the back part where he and his wife had been picking the beans, he noticed that the chickens belonging to his neighbor, Lorienne West (West), were "again" in his yard pulling out his "sprouts." They were "going down the line systematically, pulling out the shoots and eating the succulent kernel."

Martinez spent either two-and-a-half or three-and-a-half hours trying to catch the chickens. After a long "struggle," he succeeded in apprehending them. He put the chickens in one of his dive bags and called the Humane Society for instructions about what to do with them.

Martinez moved his car onto the street and was loading it up with the beans for delivery and the chickens for disposal when he heard a bicycle "ride up right behind" him. In Martinez's words, "I turned around and he [Graybeard, West's handyman and friend] had gotten the drop on me[.]" Martinez told Graybeard that he was disposing of the chickens because "you were negligent and you let them loose."

Martinez testified that Graybeard "moved his bike towards me, and I took one step towards him; and he said if you touch me, you're dead meat. And then I realize there was no more communication whatsoever. So at this point, he starts screaming at the top of his lungs: Jose David Martinez is a chicken thief. Jose David Martinez. Help. Help. Help. And then I realize that I needed to call the police."

Martinez described Graybeard's demeanor, the description here verbatim: "The one part where he said that I was dead meat, he said it in a—all the other ranting and screaming were at the top of his lung. But when he told me that you're dead meat, he told me in a very calm, collective manner, as if one person speaking to another with—with just—there's—there's no confusion there. I understood his threat."

Martinez telephoned the police and told an officer what had happened. Martinez mentioned to the officer that it was the second time Graybeard had threatened his life. According to Martinez, the officer remarked that "this situation has been going on for so long that I'm tired of it. I'm gonna come down and look into it."

When Martinez went into his house to telephone the police, Graybeard returned to West's property. Martinez testified that Graybeard then continued his "ranting" for "quite a while. I'd say 10 minutes[,]" making a racket that attracted several other neighbors. According to Martinez, ,Graybeard ranted "[t]hat I was evil; that I was a chicken thief; that I was a fool; and other things of the same nature." Martinez denied provoking or threatening Graybeard.

During his cross-examination of Martinez, Graybeard established that the gate in the fence surrounding the farm was open during the incident. His offer of proof in response to the court's query regarding the relevance of the testimony insinuated that Martinez had created the enticement in hopes of provoking an incident.

Graybeard also elicited Martinez's admission that his initial impulse during the incident was to defend himself. As Martinez related it, "my first reaction was to put my dudes up to protect myself. And then I realized that is not the answer." Martinez would not admit, however, that the harangue was prompted by an attempt on his part to hit Graybeard.

The State next called the police officer who took Martinez's call, Officer Greg Yamada (Officer Yamada). Officer Yamada testified that he could hear someone yelling in the background as he spoke with Martinez on the telephone. Officer Yamada noted that during his investigation at the scene of the incident, Graybeard was very upset and angry at being considered a suspect in the investiga-

tion. Officer Yamada said Graybeard was so upset he was "physically distressed."

On cross-examination, Officer Yamada testified that there may have been another telephone complaint made to him that day before the one from Martinez. He remembered there was a complaint from West about her chickens being stolen.

At this point, the State rested. Graybeard then tendered a motion for judgment of acquittal. Without taking or inviting response from the State, the court immediately ruled as follows: "Denied."

In his case, Graybeard offered the testimony of Natalie Cahill–Achee (Cahill–Achee), a neighbor who witnessed the altercation. She testified that both men were yelling, but that Graybeard was pleading with Martinez to spare the chickens while Martinez was taunting and tormenting him about killing and eating them. She described Graybeard's demeanor as distraught, Martinez's demeanor as swaggering and provocative. She said that Martinez "leaped at Mr. Gr[a]ybeard, and Mr. Gr[a]ybeard was holding his bicycle and like leaned back, and Mr. Gr[a]ybeard was saying go on, hit me, hit me. Then you hit me and you're dead meat." She did not, however, see Martinez attempt to hit Graybeard.

Graybeard next called West to testify on his behalf. West said she was on her property that morning and saw Martinez "chumming my chickens with bird seeds over to his place." Thereupon the court sustained an objection on the basis that the testimony was irrelevant and lacked foundation as to how West could divine Martinez's motive. This bit of testimony was apparently all that Graybeard had wanted from West, because he rested immediately after the court sustained the objection. Graybeard's attorney then stated that her testimony was offered "for the purpose of impeaching what Mr. Martinez had said." When the court excused West from the witness stand, she protested, "Judge ..., there's so much that I did see though."

Graybeard did not testify at the trial.

The State submitted on the evidence and made no argument. Graybeard's counsel ar-

gued briefly that Martinez provoked the incident and that Graybeard lacked the intent to harass him.

The court then invited West, Cahill–Achee and Martinez back into the courtroom and proceeded to render its guilty verdict and sentence, the long course of which was peppered with interjected protestations from Graybeard, West and Cahill–Achee. Aside from delivering the verdict and passing sentence, it appears the court was engaging the interlocutors in a colloquy in a quixotic attempt to convince them to end all the bad blood no matter who was at fault. The interlocutors would have none of it, and roundly condemned Martinez as an inveterate and unregenerate *agent provocateur.*

The court found Graybeard guilty of harassment in violation of Hawai'i Revised Statutes (HRS) § 711–1106(1)(b) and sentenced him to perform two hundred hours of community service and to pay twenty-five dollars to the Criminal Injury Compensation Fund.

There is no indication in the record that the court at any time engaged Graybeard in the so-called *Tachibana* colloquy or obtained his waiver of his constitutional right to testify.

**The Charge and the Harassment Statute.**

The complaint charged Graybeard as follows:

> On or about the 17th day of January, 1998, in Puna, County and State of Hawaii, PHILIP GRAYBEARD aka GRAYBEARD, with intent to harass, annoy, or alarm JOSE MARTINEZ, did insult, taunt, or challenge JOSE MARTINEZ in a manner likely to provoke an immediate violent response or which would cause JOSE MARTINEZ to reasonably believe that PHILIP GRAYBEARD aka GRAYBEARD intended to cause bodily injury to JOSE MARTINEZ or another, or damage to the property of JOSE MARTINEZ or another, thereby committing the offense of Harassment, in violation of Section 711–1106(1)(b), Hawaii Revised Statutes, as amended.

HRS § 711–1106(1)(b) (Supp.1999) provides, in pertinent part, as follows:

> A person commits the offense of harassment if, with intent to harass, annoy, or alarm another person, that person ... [i]nsults, taunts, or challenges another person in a manner likely to provoke an immediate violent response or that would cause the other person to reasonably believe that the actor intends to cause bodily injury to the recipient or another or damage to the property of the recipient or another[.]

### Questions Presented on Appeal.

Graybeard presents the following four issues on appeal.

First, Graybeard contends that the court violated his constitutional rights to confrontation and to present a complete defense when it excluded evidence of provocation by Martinez. Specifically, Graybeard complains of the court's refusal to permit evidence which would have shown that Martinez deliberately left the gate in his fence open to attract the chickens onto his property in hopes of provoking an incident. Graybeard avers that this evidence should have been admitted to impeach Martinez's credibility. He further asserts that such evidence would have established that he was provoked by Martinez and hence lacked the intent to harass, annoy, or alarm Martinez.

Second, Graybeard contends there was insufficient evidence to convict him because there was insufficient evidence to prove that he intended to harass, annoy, or alarm Martinez in a manner likely to provoke a violent response.

Third, Graybeard argues that the court erred in failing to engage him in a *Tachibana* colloquy and in not obtaining his waiver of his constitutional right to testify.

Fourth, Graybeard contends the court erred when it engaged Graybeard and his witnesses in an extended colloquy while rendering its verdict and sentence. Graybeard argues that in lecturing its interlocutors, the court betrayed a bias against him which violated his due process right to a fair trial. Graybeard also asserts that in eliciting his unsworn statements during the colloquy, the

court violated his right against self-incrimination. Graybeard further contends that the court violated his right to counsel when it circumvented direct examination by his attorney and instead elicited unsworn testimony from him and his witnesses during the colloquy. Finally, Graybeard avers that the court's colloquy with him and his witnesses violated a number of statutory rules governing proper trial procedures.

### Discussion.

Without question, the court violated Graybeard's constitutional right to testify when it failed to advise him of his right to testify and obtain his waiver of that right on the record.

In *Tachibana v. State*, 79 Hawai'i 226, 900 P.2d 1293 (1995), the Hawai'i Supreme Court held that "in order to protect the right to testify under the Hawai'i Constitution, trial courts must advise criminal defendants of their right to testify and must obtain an on-the-record waiver of that right in every case in which the defendant does not testify." *Id.* at 236, 900 P.2d at 1303 (footnotes omitted).

■ The mere absence of such a colloquy constitutes a violation of a criminal defendant's right to testify. *Id.* at 237–38, 900 P.2d at 1304–5 ("[i]f our holding in this case were to apply retrospectively, we would be compelled to affirm the circuit court's conclusion that Tachibana's right to testify was violated based solely on the lack of such a colloquy").

■ Hence the only issue remaining is whether Graybeard's conviction and sentence must be vacated. In considering that issue, the question is whether the court's failure to conduct a *Tachibana* colloquy was harmless beyond a reasonable doubt. *Id.* at 240, 900 P.2d at 1307 ("[o]nce a violation of the constitutional right to testify is established, the conviction must be vacated unless the State can prove that the violation was harmless beyond a reasonable doubt") (citations omitted).

■ In other words, "the question is 'whether there is a reasonable possibility that error may have contributed to conviction.' 'If there is ... a reasonable possibility ...,

then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.'" *State v. Akahi*, 92 Hawai'i 148, 150–51, 988 P.2d 667, 669–70 (1999) (citations omitted).

In this appeal, the State concedes there was a *Tachibana* violation, but argues that the conviction and sentence should be salvaged because the substance of Graybeard's putative testimony was supplied by the two witnesses he called on his behalf, Cahill–Achee and West, and hence the error was harmless beyond a reasonable doubt.

We cannot agree with the State.

First, as a matter of clarity, the court sustained an objection to the relevant part of West's testimony, so there was really only one witness on behalf of Graybeard at trial.

Second, although Graybeard made certain pertinent but unsworn comments during the court's feckless attempt to admonish him and his witnesses as it pronounced its verdict and sentence, there is nothing in the record to indicate what his testimony would have been, under oath at trial. *See State v. Silva*, 78 Hawai'i 115, 126, 890 P.2d 702, 713 (1995).

Finally, where the decisive issue in a case is credibility, but at trial an eyewitness extensively contradicts the State's witnesses and supports the defendant's defenses, a reasonable possibility still remains that a violation of the defendant's right to testify contributed to conviction. *Akahi*, 92 Hawai'i at 159–60, 988 P.2d at 678–79. As we held in *Akahi*, a case involving a *Tachibana* violation,

> [i]n this case, the decisive issue was credibility. As noted by counsel for [co-defendant] Grace [Akahi] in closing argument, the jury had to decide between "the police version of what occurred up at the land . . . versus Grace Akahi's version of what occurred at the land[.]" We conclude that it cannot be said beyond a reasonable doubt that, if [defendant James Kimo] Akahi's and/or [co-defendant] Kaahanui's voices had been added to Grace's version

of what occurred at the land, the jury's decision would not have been different. *Id.* at 160, 988 P.2d at 679.

In this case, Martinez's testimony tended to establish that Graybeard's conduct and demeanor during the incident were bizarre, threatening and provocative. On the other hand, Cahill–Achee's testimony suggested that Martinez was the *agent provocateur*, supporting Graybeard's sole defense that he was merely reacting to the provocation and thus did not intend to harass, annoy or alarm Martinez. The decisive issue in this case was, therefore, credibility. Cahill–Achee extensively contradicted the State's version of the incident and in doing so supported Graybeard's defense.

As in *Akahi*, we conclude that it cannot be said beyond a reasonable doubt that if Graybeard's testimony had been added to Cahill–Achee's version of the incident, the verdict would not have been different. There was, therefore, a reasonable possibility that the *Tachibana* violation in this case contributed to Graybeard's conviction. By the same token, it was not harmless beyond a reasonable doubt and his conviction and sentence must be vacated.

 Given the foregoing disposition of this case, we need not pass upon the remaining issues Graybeard presents in this appeal, save one. "[C]hallenges to the sufficiency of the evidence must always be decided on appeal." *State v. Malufau*, 80 Hawai'i 126, 132, 906 P.2d 612, 618 (1995).

> On appeal, the test for a claim of insufficient evidence is whether, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact. *State v. Ildefonso*, 72 Haw. 573, 576, 827 P.2d 648, 651 (1992); *State v. Tamura*, 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981). "'It matters not if a conviction under the evidence as so considered might be deemed to be against the weight of the evidence so long as there is substantial evidence tending to support the requisite findings for the conviction.'" *Ildefonso*, 72 Haw. at 576–77, 827 P.2d at 651 (quoting *Tamura*, 63 Haw. at 637, 633 P.2d at 1117). "'Substantial evidence' . . . is credible evi-

dence which is of sufficient quality and probative value to enable a man of reasonable caution to reach a conclusion." *See id.,* 72 Haw. at 577, 827 P.2d at 651 (quoting *State v. Naeole,* 62 Haw. 563, 565, 617 P.2d 820, 823 (1980)). *State v. Matias,* 74 Haw. 197, 207, 840 P.2d 374, 379 (1992). "Furthermore, 'it is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence[.]' " *Tachibana,* 79 Hawai'i at 239, 900 P.2d at 1306 (citation omitted).

With respect to the sufficiency of the evidence in this case, Graybeard confines his focus to the *mens rea* element of the offense. He contends there was insufficient evidence at trial that he acted with the intent to harass, annoy or alarm Martinez.

In support of this contention, he first argues that the conditional nature of Graybeard's statement during the incident (*"if you touch me,* you're dead meat") demonstrated that his intent was to react defensively to a hostile situation, and nothing more. As support for his characterization of the situation as hostile, Graybeard cites Cahill–Achee's testimony that Martinez approached him in a taunting, overbearing and provocative manner, and leaped at him.

Implicit in and necessary to this first argument is the proposition that the court erred in believing Martinez's testimony and in not believing Cahill–Achee's testimony. As previously noted, however, we will not pass upon issues dependent upon the credibility of the witnesses or the weight of the evidence.

■ Graybeard also argues that his "threat" against Martinez was justified in defense of property (the chickens) and therefore not criminal, citing HRS § 703–306 and HRS § 703–308. Graybeard argues that "he was simply attempting to stop Mr. Martinez from taking Ms. West's chickens."

We do not believe that the statement, "If you touch me, you're dead meat[,]" allegedly made in order to prevent a theft of chickens, was "immediately necessary" to that end, as required by both HRS § 703–306(1) (1993) and HRS § 703–308(1) (1993).

■ Nor do we believe that his other actions during the incident constituted "force" made justifiable by the provisions of HRS chapter 703 governing defense of property. " 'Force' means any bodily impact, restraint, or confinement, or the threat thereof." HRS § 703–300 (1993). *See also* HRS § 703–306(1); HRS § 703–308(1). That chapter simply does not contemplate Graybeard's "screaming at the top of his lungs[,]" such insults as "evil[,]" "chicken thief[,]" "fool[,]" "and other things of the same nature."

We cannot, therefore, fault the court for not finding that Graybeard's actions were justified in defense of property. Indeed, we surmise the court did not even consider the issue, as Graybeard's counsel did not in any way argue or request a finding on that defense theory. *Cf. State v. McNulty,* 60 Haw. 259, 264–66, 588 P.2d 438, 442–44 (1978) (where the defendant withdrew his request for jury instructions on the State's burden to disprove self-defense and did not object to the court's instructions as given, he was precluded from raising the issue on appeal). We observe also that though Graybeard argued below that he lacked criminal intent because he was merely responding to Martinez' provocations, he never argued or requested a finding on a theory of self-defense under HRS § 703–304.

■ In considering the sufficiency of the evidence, we view the evidence in the light most favorable to the State. From this perspective, we conclude there was substantial evidence to support the conclusion of the court: Graybeard came up behind Martinez unexpectedly and threatened him, albeit in an arguably conditional way. But then Graybeard proceeded to publicly traduce Martinez in a ten-minute tirade that was screamed "at the top of his lungs[,]" so loud that Officer Yamada could hear yelling in the background while he spoke to Martinez on the telephone. The terms Graybeard used to describe Martinez were "chicken thief[,]" "evil" and "fool[,]" among other unspecified epithets. These actions were taken without significant provocation or cognizable justification.

We believe that these facts were sufficient to enable a reasonable person to reach the

conclusion that Graybeard insulted, taunted or challenged Martinez in a manner likely to provoke an immediate violent response, with the intent to harass, annoy or alarm him.

In connection with his arguments that there was insufficient evidence to convict, Graybeard makes an interesting reference to *State v. Chung*, 75 Haw. 398, 862 P.2d 1063 (1993).

In *Chung*, the supreme court discussed the parameters of free speech and expression under the first amendment to the United States Constitution (made applicable to the states through the due process clause of the fourteenth amendment), as applied to the criminal offense of terroristic threatening under HRS § 707–716. The supreme court held that the State could criminalize as terroristic threatening only those threats that are "sufficiently unequivocal, unconditional, immediate, and specific as to convey a gravity of purpose and an imminent prospect of execution[.]" *Id.* at 417, 862 P.2d at 1073.

By "analogy" from the offense of terroristic threatening in *Chung* to the offense of harassment in this case, Graybeard argues that his statement to Martinez, "conditioned on [Martinez] first touching [Graybeard], is not a true threat and remains within the realm of constitutionally protected speech."

Because we vacate and remand this case for a new trial, we do not reach the constitutional issue:

It is axiomatic that appellate courts should pass upon constitutional issues only where the case is such that a decision of such issues is unavoidable. Since we are remanding for new trials and since the appellants on retrial may not be convicted, we do not reach or pass upon any of the constitutional issues raised in these cases.

*State v. Kam*, 68 Haw. 631, 635, 726 P.2d 263, 266 (1986). We note in passing, however, that harassment is a criminal offense significantly different from terroristic threatening. Nor can we ignore *In re Doe*, 76 Hawai'i 85, 869 P.2d 1304 (1994) (addressing the constitutionality of harassment under HRS § 711–1106).

### Disposition.

For the foregoing reasons, we vacate the May 14, 1999 judgment and remand for a new trial.